Connie A. CANADY *v.* James Ray CANADY

86-108                                    721 S.W.2d 650

Supreme Court of Arkansas
Opinion delivered December 22, 1986

552

*Mark Cambiano*, and *Dale Lipsmeyer*, for appellant.

*Stripling & Morgan*, by: *Dan Stripling*, for appellee.

GEORGE ROSE SMITH, Justice. For the second time this divorce case comes to this court, our first opinion being reported as *Canady* v. *Canady*, 285 Ark. 378, 687 S.W.2d 833 (1985). All issues except the property division were determined at the trial level. Rather than trying to decide property questions without the chancellor's having made the required specific findings, we found it necessary on the first appeal to remand the case for a retrial of the property issues. Each party testified at length and called other witnesses at the retrial. We now have before us a complete presentation of the facts. Every important issue was treated in the chancellor's final decree. Later that decree was promptly carried into effect by a public sale of all the marital property. Left for us to decide are the appellant's three arguments for reversal, all presenting essentially questions of law.

The questions all turn upon the construction of our comparatively new marital-property law. Ark. Stat. Ann. § 34-1214 (Supp. 1985). A few background facts are needed. Both parties had been previously married and owned substantial properties when they began living together in 1974. At that time James Canady owned a one-third interest in a 123-acre tract which was

being used for the operation of a profitable dairy having at times 50 or more milch cows. The other two-thirds interest was owned by James's two daughters, but they had no part in the operation of the dairy. James also had a one-sixth interest in what was to become the parties' homeplace, a 101-acre parcel at Bee Branch. James had inherited his one sixth; the rest went to his brothers and sisters. Before James's marriage to Connie in 1976 he bought the other siblings' five-sixths interest. The deed was made to him, subject to a substantial lien in favor of a third-party lender for the unpaid purchase money. James was primarily a truck driver, owning his own truck and making "good money" from long and short hauls.

Connie brought no real property into the marriage, but she had received, from her first husband and from a fire loss, money and other personal property which our first opinion estimated at $150,000. Eventually she contributed about all of it to the marriage, using it for living expenses, for improving the dwelling, for payments on the homeplace debt, and for the purchase of a 20-acre tract on which the parties installed a carwash. She testified that she and James lived well, that they had a nice home, and that she had expected it to be their home for the rest of their lives. She also testified that James took to drinking too heavily, resulting in her filing this suit for divorce in 1983. James denied the charges of drunkenness. The divorce was granted to Connie, for general indignities.

Two of the appellant's arguments do not require extended discussion. The first argument is that the chancellor should have held that Connie has a separate non-marital property interest in the 20-acre tract and in the truck used by James in his business. As to the 20-acre tract, it was purchased during the marriage with Connie's premarital funds, but the deed conveyed the property to James and Connie as husband and wife. We have held that our marital-property law does not apply to tenancies by the entirety. *Warren* v. *Warren*, 273 Ark. 528, 623 S.W.2d 813 (1981). The chancellor correctly ordered that the tract be sold and the proceeds divided equally. As to the truck, James testified that during the marriage he had the motor rebuilt at a cost of $5,000. Connie now argues that since he did not show that the five thousand dollars was not marital property, the chancellor should have returned the truck to James as premarital property only with

a stipulation in the decree that Connie be reimbursed for her contribution of half the renovative expense. To answer this argument we need not explore the complicated question of when and to what extent a contribution of marital property to the improvement of non-marital property should be considered in the return of the non-marital asset upon divorce. This truck was used in the husband's business. Whatever income that business produced presumably went back into the marriage. For obvious reasons we cannot establish a rule that whenever either spouse uses family funds for business purposes, the other is entitled to an accounting upon divorce.

The third and principal argument presents the important issue in the case. Much of Connie's testimony, supported by deposit slips and the like, showed that she contributed all or nearly all of her non-marital assets to the marriage, for living expenses, for the purchase of the 20-acre tract, for extensive improvements to the homeplace, and for the payments upon the debt secured by the homeplace. Like most married couples, neither spouse kept records during their six-year marriage. Connie testified repeatedly that she was unable to say just how her many contributions were spent. She also worked in the dairy business, but her efforts there were offset by James's work as a truck driver and need not be separately treated.

Connie argued in the trial court, as she does here, that even without any specific tracing of funds she should be repaid in some amount for her contributions. The chancellor addressed this issue in the final decree, as follows:

> 4. Throughout the course of the marriage, Plaintiff, Connie Canady, had access to very large sums of money. The Court has endeavored to trace these amounts of money. It is impossible to do so. The fact that Plaintiff had access to large sums of money does not establish that Plaintiff's funds were used in the dairy operation. However, Plaintiff has established that significant contributions, Thirty Five Thousand One Hundred Fifteen Dollars ($35,115.00), went into the purchase and improvement of other real property obtained by the parties and by Mr. Canady.

The chancellor did not order, as the plaintiff asked him to

order, that the $35,115 contribution be specified as a preferred claim against the proceeds from the sale of the homeplace, which was the only real property sold except for the 20-acre parcel. Instead, the chancellor ordered that the homeplace be sold, that from the proceeds the lien (about $60,000) be discharged first, that James receive his non-marital sixth of the proceeds, and that the remaining five sixths be divided equally. The homeplace in fact sold for $126,000, so that Connie received about $27,000.

■ · The chancellor's solution of the problem was a correct one. We do not mean that he might not have properly chosen some other way of dividing the property. What we do emphasize is that the marital-property law vests in the trial court a marked measure of flexibility in apportioning the couple's total assets.

One has only to study Section 34-1214 to realize that its overriding purpose, paramount to all other considerations, is to enable the courts to reach a decision that is equitable. As to marital property, the statute begins with the direction that all marital property be distributed equally. That division, however, is not to be made if the court finds it to be inequitable. In that event the court must make some other division, taking into consideration nine enumerated considerations: (1) the length of the marriage; (2) the age, health, and station in life of the parties; (3) their occupations; (4) their income; (5) their vocational skills; (6) their employability; (7) their estates, liabilities, needs, and future gainful opportunities; (8) "contribution of each party in acquisition, preservation, or appreciation of marital property, including services as a homemaker"; and (9) tax consequences. A perhaps significant omission from the list is comparative fault. As to property owned before the marriage, the statute first directs that it be returned to the party who owned it before the marriage, but again the directive is subject to the same nine considerations, the final goal always being a result that is equitable. Whenever the chancellor orders something other than an equal division, he must make a statement of his reasons.

■ This case is similar to several others that have reached our appellate courts since the new law was enacted in 1979. That is, the parties devoted almost all their proof to the eighth consideration, contributions made by each. Unquestionably the tracing of money or other property into different forms may be an

important matter, but tracing is a tool, a means to an end, not an end in itself. The fact that one spouse made contributions to certain property does not necessarily require that those contributions be recognized in the property division upon divorce. It was certainly not our intention to state an opposite point of view in *Potter* v. *Potter*, 280 Ark. 38, 655 S.W.2d 382 (1983). We have no doubt that the tracing of funds and even the acquisition of property before the marriage or by gift during the marriage might be inconsequential when considered at the dissolution of a marriage that had lasted for many years and had left the parties with decidedly unequal means for supporting themselves in the future.

We find that the chancellor's decree gives effect to the intent of the statute and consequently reaches an equitable result.

Affirmed.